# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0628V

| | |
|---|---|
| JILL MCANDREW,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: April 11, 2024 |

*Kathryn Lee Bruns, Faraci Lange, LLP, Rochester, NY, for Petitioner.*

*Jennifer A. Shah, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

  On January 13, 2021, Jill McAndrew filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, which was caused by the influenza ("flu") vaccine she received on October 14, 2019. Petition at ¶¶ 1-2, 8, 38. She maintains that "[her] left shoulder pain began within one hour of her . . . vaccination and has persisted ever since." *Id.* at ¶ 38.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find there is preponderant evidence establishing that the onset of Petitioner's SIRVA occurred within 48 hours of vaccination. Specifically, Petitioner likely suffered pain within an hour of vaccination.

## I.    Relevant Procedural History

A few weeks after filing the Petition, Ms. McAndrew filed an affidavit and some of the medical records required by the Vaccine Act. Exhibits 1-8, 10, ECF No. 5; *see* Section 11(c). She also filed photographs of her left and right arms. Exhibit 9, ECF No. 5. Petitioner filed the remaining medical records over the subsequent eight-month period. Exhibits 11-14, filed July 21, 2021, ECF No. 12; Exhibits 15-17, filed Sept. 17, 2021, ECF No. 14. On September 21, 2021, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 18.

While awaiting the HHS review, the parties worked to ensure all prior medical records had been provided. After it was noted that Petitioner's earliest primary care provider ("PCP") record was from an annual exam only 14 months prior to vaccination, she was instructed to address the issue further. Order, issued Nov. 23, 2021, ECF No. 23 (citing Exhibit 3 at 2).

In response, Petitioner filed updated medical records and a supplemental declaration.[3] Exhibits 18-19, filed Feb. 1, 2022, ECF No. 24. In the declaration, Petitioner explained that she was in very good health at the time of vaccination and obtained much of her routine care from her cardiologist and gynecologist. Exhibit 19 at ¶¶ 4-5. She added that she had the same PCP from 2013 through 2019, but was not seen by this provider from 2016 through 2018. *Id.* at ¶¶ 3, 7.

More than eight months later, on October 25, 2022, Respondent stated he was willing to engage in settlement discussions. ECF No. 35. During the subsequent six-month period, the parties exchanged several offers and counteroffers. *See,* e.g., Status Report, filed Mar. 2, 2023, ECF No. 41. On April 17, 2023, Petitioner informed me that the parties had reached an impasse in their settlement discussions. ECF No. 42.

Approximately 45 days later, on May 31, 2023, Respondent filed his Rule 4(c) Report opposing compensation. ECF No. 43. Specifically, he maintained that "[t]he record does not demonstrate that the onset of petitioner's alleged left shoulder pain was within forty-eight hours of the subject vaccination." *Id.* at 6. Regarding a non-Table or causation-

---

[3] The declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 19.

2

in-fact claim, Respondent insists the "medical records do not provide the requisite evidence to establish that the flu vaccine in fact caused her alleged injury." *Id.* at 7.

I have determined that a factual finding related to pain onset may help resolve this claim. Thereafter, I encourage the parties to renew their settlement discussions, and Respondent will be allowed the opportunity to raise any additional objections to compensation in an amended Rule 4(c) Report.

## II.     Issue

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a) XIV.B. (2017) (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

## III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the

3

patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

4

## IV.   Finding of Fact

I make this finding related to onset after a complete review of the record to include all medical records, affidavits, and additional evidence filed. Specifically, I base the finding on the following evidence:

- Prior to the vaccination at issue, Petitioner received treatment from her PCP, cardiologist, gynecologist, and urologist. Exhibit 13, 16-17. In relatively good health, Petitioner suffered primarily from high blood pressure and cholesterol. *E.g.,* Exhibit 3 at 2-14.

- There is some evidence showing Petitioner suffered adhesive capsulitis in either her right or left shoulder more than twenty years ago. *See* Exhibit 4 at 3 (first orthopedic appointment); Exhibit 1 at ¶ 4 (Petitioner's affidavit). Given the length of time that has passed, the medical records related to that earlier condition have not been provided.

- Petitioner received the flu vaccine alleged as causal intramuscularly in her left deltoid on October 14, 2019, at a Walgreen's Pharmacy. Exhibit 2 at 2, 16. She was 67 years old at the time of her vaccination. *E.g.,* Exhibit 3 at 14.

- In her affidavit, Petitioner stated that "[her] left arm and shoulder were in extreme pain almost immediately and the pain continued for weeks." Exhibit 1 at ¶ 6. She added that she "also had bruising at the injection site for 4-5 days." *Id.*

- Petitioner first sought medical treatment on December 13, 2019, sixty days post-vaccination. Exhibit 3 at 14-15. The medical record from this visit indicates Petitioner was still complaining of left arm pain and soreness after receiving a flu shot at Walgreens in October 2019, and "point[ed] to [the] area of insertion of [the] deltoid tendon as the area of injection." *Id.* at 14. Theorizing that Petitioner may be experiencing a hematoma, improper injection, and/or high dose reaction, the PCP determined Petitioner should begin physical therapy ("PT") if her symptoms continued after an upcoming trip. *Id.* In her affidavit, Petitioner explained that she planned to spend January and February in Florida with her husband. Exhibit 1 at ¶ 7.

- On March 3, 2020, Petitioner returned to her PCP, stating that she "[wa]s still having a lot of pain in her left arm from an injection . . . in October."

5

Exhibit 3 at 16. She pointed to her smallpox scar as the site of injection. *Id.* Observing tenderness and "crying pain at [the] insertion of [the] left deltoid," her PCP ordered x-rays and referred Petitioner to an orthopedist prior to initiating PT. *Id.* at 16-17. Under current medications, it was noted that Petitioner should apply Voltaren gel to the affected site as needed. *Id.* at 16.

- Approximately one week later, on March 11, 2020, Petitioner visited the orthopedist for pain and dysfunction of her left shoulder. Exhibit 4 at 1-4. Describing her pain as located in the left deltoid and radiating into her shoulder, she reported that the "vaccine was given too low in her arm, and she has had pain since." *Id.* at 1. The orthopedist noted that Petitioner "has had problems since she received a flu injection back in October 2019," but he observed no deformity, swelling, erythema,[4] warmth, or atrophy upon examination. Exhibit 4 at 3. Adding that Petitioner's pain was worsening, and the x-rays taken earlier were normal, the orthopedist assessed Petitioner as suffering from frozen shoulder. He theorized that "it may have had something to so with the flu injection, [s]he may have had her arm sore and then stopped using her shoulder normally because of soreness." *Id.* Indicating there was no need for an MRI yet, he prescribed Meloxicam[5] and PT. Exhibit 4 at 3.

- At this initial March 11th visit, the orthopedist also discussed Petitioner's statement that she had a frozen shoulder previously, and that she believed it also had occurred in her left shoulder and took a long time to resolve. Exhibit 4 at 3. In her affidavit, Petitioner clarified that this earlier episode happened more than 20 years ago, that she could not recall which shoulder was involved, and that she had not experienced any shoulder pain or limitations in range of motion ("ROM") since that time. Exhibit 1 at ¶ 4.

- Two days later, on March 13, 2020, Petitioner presented for her first PT session. Exhibit 6 at 2. The record from this session describes Petitioner's injury as occurring suddenly on October 14, 2019, when she received a flu shot. *Id.* Petitioner was described as exhibiting limitations in her ROM, but tolerating the exercises well. *Id.* at 3.

---

[4] Erythema is "redness of the skin produced by congestion of the capillaries." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 643 (32th ed. 2012).

[5] Meloxicam is "a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis; administered orally. DORLAND'S at 1126.

6

- Petitioner attended two additional PT sessions, on March 16 and 19, 2020. Exhibit 6 at 5-8. In the record from the March 19th session, it was noted that Petitioner would transition to stretching and a home exercise program. *Id.* at 7.

- On April 1, 2020, Petitioner returned to the orthopedist. Exhibit 4 at 5-8. She reported that she was no longer attending PT but was taking the prescribed Mobic,[6] adding that neither treatment had alleviated her symptoms. Exhibit 4 at 5, 7. However, she stated that she had taken some of her husband's Gabapentin, which provided limited relief. *Id.* Acknowledging that she had stiffness in her shoulder, Petitioner stated that she "believe[d] the problem [wa]s in her arm where she had the flu shot." *Id.* at 7.

- Upon examination, the orthopedist observed no swelling, redness, or warmth, but some fluid and tenderness. Exhibit 4 at 7. He also observed that Petitioner "had good elbow and wrist motion." *Id.* Opining that he did not believe a steroid injection would be helpful, the orthopedist recommended proceeding with an MRI. He instructed Petitioner to use Tylenol PM at night to help her sleep. *Id.*

- The results of the MRI, performed the next day on April 2, 2020, were normal. Exhibit 3 at 16.

- When Petitioner returned to the orthopedist the next day, she continued to complain of swelling and tenderness in her proximal arm, at the site of vaccine injection. Exhibit 4 at 10. Acknowledging that he was "not sure how to help the patient," the orthopedist gave Petitioner a copy of the MRI, showing "no bone problem or a soft fluid accumulation." *Id.*

- On April 27, 2020, Petitioner attended a telehealth appointment with the New York Spine and Wellness Center ("NYSWC") for treatment of her left arm pain. Exhibit 5 at 45-48. Reporting pain in her upper arm at the location of a flu shot she received on October 14, 2019, Petitioner stated that the pain, currently rated at six out of ten, sometimes "shoots up her arm to her shoulder blade and down into her wrist, but not quite into her hand." *Id.* at 45. The treating physician ordered EMG testing and "a more aggressive

---

[6] Mobic is a "trademark for a preparation of meloxicam." DORLAND'S at 1171.

neuropathic medication regime" (*id.* at 48) - increased dosages of Gabapentin and nortriptyline[7] at night (Exhibit 5 at 47).

- Performed on May 8, 2020, the results of Petitioner's EMG testing were normal. Exhibit 5 at 4.

- On May 22, 2020, Petitioner returned to the NYSWC for additional treatment. Exhibit 5 at 39-44. In the record from this visit, she again attributed her symptoms to the flu vaccine she received on October 14, 2019. *Id.* at 40, 43. The nurse practitioner treating Petitioner ordered a second left shoulder MRI and testing to rule out deep vein thrombosis. *Id.* at 43. She stated that Petitioner should consider undergoing a left stellate ganglion nerve block to rule out chronic regional pain syndrome if the ordered testing was negative. *Id.*

- The results of an upper left sided vascular venous ultrasound performed that same day (May 22, 2020) were unremarkable. Exhibit 5 at 16. "No abnormal masses or fluid collections [were] detected." *Id.* Under clinical history, the test results listed "[p]ain and swelling [of] the] left upper arm after flu shot in October." *Id.*

- The second left shoulder MRI (performed on June 1, 2020) revealed "[f]indings suggesting adhesive capsulitis." Exhibit 4 at 14.

- Petitioner attended another telehealth appointment with the nurse practitioner at the NYSWC on June 24, 2020, to discuss her recent test results. Exhibit 5 at 34-38. Expressing frustration at the inability of medical treaters to provide a definitive diagnosis for her condition, Petitioner reported she was in too much pain for PT and that her left arm was more swollen than her right. The nurse practitioner again discussed the possibility of a nerve block but stated Petitioner should first have an in-person appointment with a physician. *Id.* at 38.

- On July 13, 2020, Petitioner attended an in-person appointment at NYSWC. Exhibit 5 at 29-33. Noting that Petitioner had improved with her current neuropathic medication regime and had experienced no side effects from the medication, the treating physician increased her dosages. *Id.* at 33. He also prescribed lidocaine patches and advised Petitioner to participate in

---

[7] Nortriptyline hydrochloride is medication, administered orally, "used to treat panic disorder and to relieve chronic, severe pain." DORLAND'S at 1291.

8

- some type of home exercise program to combat her adhesive capsulitis. After Petitioner expressed her unwillingness to undergo a stellate ganglion nerve block, the physician suggested a trial "of Tramadol[8] to help facilitate physical therapy." Exhibit 5 at 33.

- On July 24, 2020, Petitioner underwent an MRI of the cervical spine, revealing mild disc protrusion and narrowing within from C3 to C6 and mild central canal stenosis in C6 and C7. Exhibit 4 at 12.

- When she returned to NYSWC a few days later, on July 29, 2020, Petitioner reported 85 percent improvement but some mild swelling and tenderness at the site of injection. Exhibit 5 at 24. She also had a right-sided breast biopsy which was preventing her temporarily from performing her exercises. *Id.* Petitioner's active problems now included intractable neuropathic pain of the upper extremity and radicular pain in the left arm, in addition to left shoulder pain and frozen shoulder. *Id.* at 25. The nurse practitioner renewed Petitioner's Gabapentin and prescribed Tramadol. *Id.* at 27.

- Petitioner began a second round of PT on October 29, 2020. Exhibit 8 at 2. At her initial evaluation, she again reported that her left shoulder pain "started as soon as she got her flu shot in 10/14/2019." *Id.* at 4. Petitioner reported that she currently had no pain, but that the level of her pain was eight at its worst. *Id.* By her second PT session on November 4, 2020, Petitioner reported "feeling better already, [with] [l]ess pain in the shoulder and more mobility." *Id.*

- From late October 2020 through March 2021, Petitioner attended 31 PT sessions. Exhibits 8, 13. During recertification on March 18, 2021, she reported improved functionality, greater strength and stability, but some difficulty still gripping items, reaching behind, and lifting heavy objects. Exhibit 13 at 51. The physical therapist opined that Petitioner "would benefit from a few more weeks of PT." *Id.*

- When Petitioner returned to PT five days later, on March 23, 2021, she stated that her primary complaint was for lower back and left buttock pain. Exhibit 13 at 55. She explained that she had tried lifting her television and fell on her lower back and leg. *Id.* It appears that she attended five more PT

---

[8] Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery; administered orally." DORLAND'S at 1950.

9

    sessions in March and April 2021, for symptoms from this later injury. *Id.* at 61-72.

- On June 2, 2021, Petitioner was discharged from PT because she was undergoing "gastro surgery." Exhibit 13 at 73.

- Petitioner also provided photographs which she claims show her left arm swelling and atrophy and differences between her left and right forearms. Exhibit 9 (photographs); Exhibit 19 (supplemental declaration). The photographs included in Exhibit 9 are not dated, but Petitioner states that the photograph included in her declaration was taken in October 2021. Exhibit 19 at ¶ 11.

    The record as a whole supports Petitioner's description of pain as occurring almost immediately post-vaccination – within an hour. *See* Petition at ¶¶ 9, 38. In multiple post-vaccination medical records, Petitioner consistently reported left shoulder pain that began upon vaccination. Exhibit 3 at 14, 16; Exhibit 4 at 1; Exhibit 5 at 45; Exhibit 6 at 2. Without fail, she attributed her injury to the flu vaccine she received in October 2019. *Id.* On multiple occasions she identified the date of onset as October 14, 2019. Exhibit 5 at 45; Exhibit 6 at 2. While these entries were based upon information provided by Petitioner, they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care.

    The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied <u>to</u> or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added). Thus, the Circuit has instructed that greater weight should be accorded to this information even when the information is provided by a patient (such that it could still be somewhat subjective).

    Furthermore, Petitioner's assertions are supported by the opinions of her PCP, orthopedist, and physical therapist. Her PCP suggested that her condition, characterized as a reaction, "may be hematoma, injection into site other than muscle belly, or high dose reaction, or some combination of these. Exhibit 3 at 14. The orthopedist opined that he thought her condition "may have had something to do with the flu injection." Exhibit 4 at 3. All medical providers appeared to credit and rely upon Petitioner's assertions related to pain onset.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination. Specifically, I find the onset of petitioner's pain within an hour of vaccination.

## V. Remaining Requirements for Entitlement

Although I have determined that Petitioner's pain onset occurred within the period required for a Table SIRVA, further development of the record is needed before I address the other requirements of entitlement. Petitioner's case is complicated by the fact that her symptoms and circumstances are not reflective of a typical SIRVA injury.

As shown throughout the medical records in this case, Petitioner complained of pain at the injection site of a vaccine administered too low in her left deltoid that radiated into her shoulder and down her arm. And she gained relief primarily from medication used to treat neuropathic pain such as her husband's Gabapentin. However, the results of EMG testing performed in early May 2020 were normal, and thus not corroborative of the complained-of injury. Exhibit 5 at 4.

At the same time, it does appear that Petitioner had a reaction at the site of vaccination. In the medical histories she provided, Petitioner consistently described an injection site reaction accompanied by redness, pain, and swelling at the injection site. Exhibit 3 at 14, 16; Exhibit 4 at 1; Exhibit 5 at 45; Exhibit 6 at 2. And the PCP who was the first to treat Petitioner, approximately 60 days post-vaccination, discussed the possibility that her condition was a reaction to the flu vaccine. Exhibit 3 at 14.

However, it is difficult to determine the severity and duration of this reaction. Although Petitioner's orthopedist observed no redness, warmth, or swelling at her first appointment in March 2020, he noted some swelling during the next appointment one month later. Exhibit 4 at 3, 7. However, the photographs Petitioner provided do not show the significant differences Petitioner claims. *See* Exhibit 9; Exhibit 19 at ¶ 11.

Most importantly, it does not appear that Petitioner even underwent the testing recommended to rule out chronic regional pain syndrome. Exhibit 5 at 43, 33 (chronologic order). And the spinal MRI reveal some abnormal findings. Exhibit 4 at 12.

Although Respondent did not raise any additional objections to entitlement in his Rule 4(c) Report, I will allow him the opportunity to amend that document to update it in light of these fact findings. Additionally, the parties should renew their settlement discussions to determine whether they can reach an informal settlement, following my pain onset determination and other issues discussed in this ruling.

## VI.     Scheduling Order

As set forth in his Rule 4(c) Report, Respondent's only objection to compensation was the contention that Petitioner had failed to establish the pain onset needed for a Table SIRVA. Thus, he should provide his current position in light of my finding regarding pain onset. Additionally, the parties should resume their settlement discussions to determine whether they can informally resolve this case.

**The parties shall file a joint status report updating me on their renewed settlement discussions by no later than <u>Monday, May 13, 2024</u>. Petitioner also should file any updated medical records as soon as possible.**

**Respondent shall file an amended Rule 4(c) Report, stating whether he has any other objections to compensation by no later than <u>Friday, June 14, 2024</u>.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master